# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Sanchez*, 2013 IL App (2d) 120445

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIRIAM SANCHEZ, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0445 |
| Filed | June 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for identity theft was reversed on the ground that the State failed to prove that she had the necessary criminal intent, even though she was an illegal alien who used a social security number belonging to another person in order to obtain employment, since there was no evidence that defendant knew the number belonged to "another person." |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 11-CF-1392; the Hon. Allen M. Anderson, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Donald R. Zuelke, of Zuelke & Byrd, LLC, of St. Charles, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Victoria E. Jozef, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice Hutchinson concurred in the judgment and opinion.
Justice Birkett dissented, with opinion.

## OPINION

¶ 1    On February 3, 2012, following a bench trial, the defendant, Miriam Sanchez, was convicted of one count of identity theft of "credit, money, goods, services, or other property" worth between $10,000 and $100,000 (720 ILCS 5/16G-15(a)(1) (West 2010)). Sanchez is not a United States citizen. The conviction flowed from Sanchez's use of a social security number that was not hers to qualify for a job in which she earned a total of $22,656.30 over the course of approximately 17 months. Her motion for a new trial was denied and she was sentenced to one year of conditional discharge. She appeals, arguing that (1) the evidence was insufficient to prove that she had the necessary criminal intent; (2) the evidence was insufficient to show that she committed "theft" of any "money, goods, *** or other property," because she worked for her wages and both her employer and her victim testified that her deception had not harmed them; and (3) the trial court wrongly found that the affirmative defense of necessity did not apply. We agree with her first argument and reverse.

¶ 2                              BACKGROUND
¶ 3    Sanchez was born in Guadalajara, Mexico. When she was about three years old, her parents brought her to the United States. Sanchez grew up in Aurora. Although she speaks Spanish in addition to English, she has never been back to Mexico and thinks of herself as American. Sanchez testified that she did not find out that she was in this country illegally until she was in high school and wished to take driver's education. At that time, she found out that, because she was not in the country legally, she could not get a driver's license. Although her father tried to obtain legal residency status for her at that point, he was unsuccessful.

¶ 4    In 2006, when Sanchez was a senior in high school, she became pregnant. Sanchez graduated from high school in 2007. Her son was born on July 12, 2007. Sanchez began looking for work before her son was born. Sanchez was living with her boyfriend, Hector,

-2-

in the home of Hector's parents. Sanchez and Hector paid rent and a portion of the household bills, and did not get any help in paying for diapers, food, or clothing for the baby. Although Hector had occasional work through temporary agencies, Sanchez needed income as well to pay their bills. Sanchez believed Hector when he told her that she had to look for a job or they would be kicked out. Sanchez had never worked before, because when she was a student and lived at home, her parents (both of whom worked) supported her. Sanchez testified that she did not want to move back to her parents' home because it would have put more pressure on her mother at a time when her father was ill. Sanchez's father was diagnosed with cancer in January 2008, and he died 10 months later.

¶ 5        Sanchez looked for "cash paying jobs like at supermarkets" where she would not need a social security number to work, but could not find any. At some point, she obtained a social security number that was not hers. She bought it from "a random guy" she did not know. She thought the number was not assigned to anyone. Even after getting the number, she continued to look for jobs where she could be paid in cash and would not need the number, but she was not successful. She then began looking for work through temporary agencies.

¶ 6        In January 2008, Sanchez applied for work with Atlas Staffing, using a false social security card with her name and the number she had obtained. In the process of applying, Sanchez showed the card and allowed it to be photocopied, and she filled out several forms (a federal I-9 form and tax forms) on which she wrote the number and signed her name. Sanchez testified that this was the only time she used the social security number to get employment and that she never used it for any other purpose, such as to apply for credit or government benefits.

¶ 7        In March 2008, Sanchez obtained a temporary job through Atlas Staffing. She worked through Atlas until July 2009. During that period, she earned a total of $22,656.30. She used this money to pay bills and meet the needs of her baby. Anna Jarnebro, the comptroller for Atlas Staffing, testified that Sanchez was paid wages for the work she performed, never stole from the company, and left as an employee in good standing. Jarnebro had no knowledge of anything negative about Sanchez.

¶ 8        In September 2009, Aurora police officer Donald Corp was assigned to investigate potential identity theft. He spoke with Sanchez and took a recorded statement from her. In the statement, Sanchez admitted that she had obtained employment through Atlas Staffing by using a social security number that was not hers. She did not steal the number and thought that it was a random and unassigned number when she bought it. She had since destroyed the false documents she bought (which included a social security card and a State of Illinois identification card), because she had married a United States citizen and was pursuing citizenship through legal procedures. Corp testified that Sanchez was 100% cooperative and was very remorseful. Sanchez also indicated to Corp that she would be willing to pay restitution, but his investigation did not reveal that anyone was out any money. Corp's investigation showed that Sanchez never used the social security number for anything other than getting a job and had not engaged in any other criminal activity. An audio recording of Corp's interview of Sanchez was played at trial and admitted into evidence without objection. The recorded interview lasted for approximately 8½ minutes. The recording appeared to have been made after Corp and Sanchez had already spoken together, as in it

-3-

Corp referred to Sanchez having previously told him certain things (such as Sanchez being willing to pay restitution or do anything else necessary to make things right). Generally speaking, the recording confirmed Corp's in-court account of the interview.

¶ 9    The social security number used by Sanchez belonged to Maria Hernandez. At trial, Hernandez stated that she was an "extremely good friend[ ]" of Sanchez's mother. In the interview of Sanchez, Hernandez's name was mentioned twice. The first time was approximately halfway through the interview, when the following exchange occurred:

"[CORP]: And this Social Security number, you don't know who it belonged to?

[SANCHEZ]: No, I don't.

[CORP]: Okay. And I brought–mentioned the name Maria Hernandez earlier, that's who it actually belongs to, and you don't know Maria Hernandez?

[SANCHEZ]: No, I don't."

The second mention of Hernandez was near the end of the interview:

"[CORP]: We had talked about earlier as well–obviously, Miss Hernandez, you know, felt the need to file a police report. You know, she got some documents from the IRS and there was a concern there. So it's been a little bit of a heartache for her, obviously. She hasn't suffered any financial loss, you know, but again, she–they may try to go after her. With that being said, if Miss Hernandez were to hear this, what would you like to tell her in your own words?

[SANCHEZ]: That I'm extremely sorry for the inconvenience that she had to pass and if there's anything I can help her with, I'll be glad to help her.

[CORP]: Okay. And we had mentioned just a short time before we started this tape that restitution is something that you'd be willing to do. And you understand what restitution is?

[SANCHEZ]: Yes.

[CORP]: Okay. You know, if the IRS comes back and says, 'hey, you owe *x* amount of dollars,' you'd be willing to pay that–not necessarily in one lump sum–but at some point to help rectify and make the situation better.

[SANCHEZ]: Yes.

[CORP]: That's something you'd be willing to do as well, correct?

[SANCHEZ]: Yes, I do.

[CORP]: Okay. Is there anything else that you would like to add or that you can think of with regards to this?

[SANCHEZ]: No, pretty much, I'm sorry, *** sorry that she had to go through this. And again, if there's pretty much anything I can help her with, I'll be glad to do it."

At trial, both Hernandez and Sanchez testified that they did not know, until after Sanchez spoke with Corp, that the number Sanchez had used belonged to Hernandez.

¶ 10    Hernandez testified for the State that she did not give Sanchez permission to use her social security number. Hernandez did not know of Sanchez or anyone else using her number for any purpose other than the one occasion on which Sanchez used it to get a job; no one

ever used it to open any accounts or get any credit cards. Hernandez was not out any money from Sanchez's use of the number. Hernandez was also called by the defense and testified that she was aware of Sanchez's reputation for truthfulness and honesty in the community, and that it was excellent.

¶ 11 On September 30, 2009, Sanchez was charged by complaint with identity theft of between $300 and $2,000, under section 16G-15(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/16G-15(a)(1) (West 2010)). She was indicted on a more serious level of the same charge (identity theft of between $10,000 and $100,000) in May 2010. In July 2011, the trial court granted Sanchez's motion to dismiss the indictment for failure to allege an element of the offense. The State refiled the charge and the case proceeded to a bench trial on January 30, 2012. On February 3, 2012, the trial court issued its ruling, finding Sanchez guilty of identity theft of between $10,000 and $100,000, a Class 1 felony. On March 14, 2012, after denying Sanchez's motion for a new trial, the trial court sentenced her to one year of conditional discharge.

¶ 12 Sanchez, who married a United States citizen in September 2010, now has three children. She is currently pursuing citizenship for herself. She filed a timely notice of appeal from her conviction.

¶ 13                                ANALYSIS

¶ 14 On appeal, Sanchez raises three arguments: (1) that the State did not prove beyond a reasonable doubt that she knew that the social security number she used belonged to another person, as required for a conviction; (2) that the State did not prove beyond a reasonable doubt that she committed a "theft" of $10,000 or more by receiving wages for work she performed at a job she obtained by fraud; and (3) that the trial court erred in rejecting her affirmative defense of necessity. As we find the first argument persuasive, we do not reach the others.

¶ 15                    Sufficiency of the Evidence: *Mens Rea*

¶ 16 Sanchez's primary argument on appeal is that the evidence was insufficient to prove beyond a reasonable doubt that Sanchez had the necessary mental state to sustain a conviction of identity theft. The State responds by asserting that the evidence was sufficient.

¶ 17 Section 16G-15(a)(1) of the Code provides that a person commits identity theft when he or she knowingly "uses any personal identifying information or personal identification document of another person to fraudulently obtain credit, money, goods, services, or other property." 720 ILCS 5/16G-15(a)(1) (West 2010). Thus, the *mens rea* that must be proved is that the defendant acted knowingly.

¶ 18 In this case, there are two components to the question of the sufficiency of the evidence regarding Sanchez's mental state. The first is whether the State was required to prove both (a) that Sanchez knowingly used "personal identifying information" (*i.e.*, a social security number) and (b) that she knew that it was a social security number "of another person." As this is an issue of statutory interpretation, we consider it *de novo. Lee v. John Deere*

*Insurance Co.*, 208 Ill. 2d 38, 43 (2003). The second component is whether, assuming that the State was required to show that Sanchez knew that the number belonged to someone else, the evidence was sufficient to meet this requirement. This issue is subject to the familiar standard enunciated in *People v. Collins*, 106 Ill. 2d 237 (1985). Under that standard, the relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In assessing the sufficiency of the evidence, we do not retry the defendant, reweigh the evidence, or substitute our judgment for that of the trier of fact regarding the credibility of a witness. *People v. Ross*, 407 Ill. App. 3d 931, 935 (2011). However, we bear in mind that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); see also *People v. Carpenter*, 228 Ill. 2d 250, 264 (2008). "Simply stated, the fact that defendant is 'probably' guilty does not equate with guilt beyond a reasonable doubt." *People v. Ehlert*, 211 Ill. 2d 192, 213 (2004). If, after a careful examination of the evidence, we "are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, we must reverse the conviction." *People v. Smith*, 185 Ill. 2d 532, 541 (1999); see also *People v. Hernandez*, 312 Ill. App. 3d 1032, 1036 (2000) ("That is, a criminal conviction cannot stand on appeal if the prosecution's evidence is so weak as to create a reasonable doubt [as to] defendant's guilt."). Although the determinations of the trier of fact are given great deference, they are not conclusive. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). We will set aside a criminal conviction if "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Id.*

¶ 19    At trial, the State argued that the "knowingly" *mens rea* applied only to the word that immediately follows it in the statute, "uses." The State contended that it was required to show only that Sanchez knowingly used the social security number–that is, that she did not simply write down Hernandez's number by mistake. On appeal, however, the State concedes that Sanchez is correct in arguing that it was required to prove that she knew that the number belonged to another person. We agree with the State's current reading of the statute.

¶ 20    In *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), the United States Supreme Court construed a federal identity theft statute that was very similar to the Illinois identity theft law. The federal statute provided that it was a crime to "knowingly transfer[ ], possess[ ], or use[ ], without lawful authority, a means of identification of another." 18 U.S.C. § 1028A(a)(1) (2006). That case, like this one, involved an illegal immigrant who used a counterfeit social security card to obtain employment. Unbeknownst to the defendant, the number belonged to someone else. The government argued that the "knowing" requirement applied to the "use" element and to the element that such use was "without lawful authority," but not to the element that the identification belonged to "another." *Flores-Figueroa*, 556 U.S. at 648. The Supreme Court rejected this argument, holding that the statute required the government to show that the defendant knew that the number he used belonged to another person. *Id.* at 657. It noted that "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as

applying that word to each element." *Id.* at 652.

¶ 21        In *People v. Hernandez*, 2012 IL App (1st) 092841, a recent case involving the Illinois identity theft law, the First District of the Appellate Court adopted the reasoning of *Flores-Figueroa*. The court noted that our own supreme court has held (interpreting a different criminal statute) that, when a mental state such as "knowingly" is placed near the beginning of a statute, it is "the requisite mental state applicable to the provision as a whole." *People v. Frieberg*, 147 Ill. 2d 326, 347 (1992). In accord with this principle, in order to prove that a defendant committed identity theft under section 16G-15(a)(1) of the Code, the State must prove that he or she "knew the personal identifying information that [he or] she used was that 'of another person.' " *Hernandez*, 2012 IL App (1st) 092841, ¶ 39. We agree with the analysis in *Hernandez* and accept the State's concession that it was required to show that Sanchez knew that the social security number she used to get a job belonged to someone else. We now turn to the question of whether the evidence, viewed in the light most favorable to the State, established such knowledge.

¶ 22        Even under the deferential *Collins* standard, we must conclude that the evidence does not show that Sanchez knew that the social security number she used belonged to someone else. The only direct evidence on this issue is Sanchez's own testimony that she thought the number was a "random," unassigned number, and did not know that it belonged to another person. Sanchez's testimony on this point was consistent with her earlier statement to the police, in which she expressed remorse, offered restitution, and asserted that she did not know that the number belonged to anyone.

¶ 23        The State argues that there was conflicting evidence regarding Sanchez's knowledge, allowing the trial court to resolve the conflict in the State's favor. The State points to evidence that Sanchez knew she could not get a valid social security number because, after she found out she could not get a driver's license, she knew she was not in this country legally; that she paid someone outside of legal channels to acquire the number; and that, when she used the number, she obtained employment and was able to work and receive wages for over a year. In response to Sanchez's oral motion for a directed finding, the trial court found that the State had made out a *prima facie* case of identity theft because the evidence showed that (1) Sanchez had paid someone for the number and (2) the number was successful in that it allowed employment.

¶ 24        However, neither the evidence cited by the State nor the trial court's conclusions address the issue at hand, because they do not show that Sanchez knew that the social security number *belonged to someone else*. The evidence did show that Sanchez knew that the number she used was not her own–she had to purchase it from someone, rather than getting it from the Social Security Administration. However, this does not imply any knowledge that the number belonged to someone else; it could have been a made-up number. Similarly, the fact that the number "worked" (in that it allowed Sanchez to get a job) does not establish that a reasonable person should have known that it was the social security number of a real person. There was no testimony from Atlas Staffing that, in fact, the number used by Sanchez was identified by the Social Security Administration as being either genuine or fraudulent, nor any evidence that, for the purposes of working at a temporary employment agency, a real number "works" better than a made-up number. Absent evidence to the contrary, there is no

basis to doubt that made-up social security numbers are equally successful in allowing employment. Moreover, Sanchez would not have known that the number "worked" until she had used it successfully at least once to get employment. Because Sanchez testified that Atlas Staffing was her first job, her after-the-fact knowledge that the number "worked" cannot show that she knew, when she used the number, that it belonged to another person. Accordingly, none of this evidence supports Sanchez's conviction for knowingly using a number belonging to someone else.

¶ 25    The State argues that the lack of direct evidence of Sanchez's knowledge is not fatal, because knowledge is ordinarily proven by circumstantial evidence. We have no quarrel with this principle, but it cannot sustain a conviction where, as here, none of the evidence–circumstantial or otherwise–demonstrates that Sanchez knew that the number belonged to someone else.

¶ 26    The dissent disagrees, arguing that circumstantial evidence indeed establishes the element of *mens rea*. Contrary to the dissent's suggestion, we have not overlooked or ignored the items it points to. We simply believe that they do not meet the requirement that a criminal conviction must be based on facts established by the evidence or reasonable inferences from those facts, and not on speculation.

¶ 27    The primary evidence pointed to by the dissent is that: (1) Hernandez was a good friend of Sanchez's mother; and (2) in her recorded interview with the police, Sanchez denied knowing Hernandez. Although the State did not point to either of these facts in its arguments about the sufficiency of the evidence, we of course may affirm on any ground supported by the record. *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007). However, neither of these facts constitutes evidence that Sanchez knew that the social security number she used belonged to a real person.

¶ 28    The dissent argues that it is " 'simply unbelievable' " that it was mere coincidence that the number Sanchez used belonged to a close friend of her mother. *Infra* ¶ 52 (quoting *People v. Hart*, 214 Ill. 2d 490, 520 (2005)). However, such a coincidence is not so inherently improbable that it must be rejected as a matter of common sense. The friendship does not in itself provide evidence that Sanchez obtained the number from Hernandez, as even close friends typically do not share social security numbers with each other. Nor does the friendship demonstrate that Sanchez had access to the number: social security numbers are treated as private information to be safeguarded, and people generally do not carry the numbers on their persons or leave them lying about in open view. Sanchez testified that she obtained the social security card with Hernandez's number on it from a forger in her community. The forger could have had even better access to Hernandez's number than Sanchez did. We are not assuming that this is so; we are simply making the point that, on this record, we cannot know. "An inference is 'a conclusion as to the existence of a particular fact reached by considering other facts in the usual course of human reasoning.' " *People v. Steading*, 308 Ill. App. 3d 934, 940 (1999) (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 302.2, at 93 (7th ed. 1999)). A reasonable inference may support a criminal conviction. However, there is a line between reasonable inference and mere speculation.

¶ 29     The record here contains no evidence to support the conclusion that, regardless of how "suspicious" it may appear, Hernandez's friendship with Sanchez's mother was anything other than coincidence. Hernandez herself testified that she did not provide Sanchez with her number, and neither the dissent nor the State has suggested that Hernandez testified untruthfully in this regard. Moreover, any suggestion that Hernandez conspired with Sanchez to allow her to use the number is undermined by the fact that Hernandez later called the police to investigate when she received a notice from the IRS.

¶ 30     If Hernandez did not willingly share her social security number with Sanchez, then the dissent's argument rests on the idea that Sanchez somehow acquired the number from Hernandez without her knowledge and provided it to the forger. But how? Did Hernandez have the number written down and carry it with her to some event where Sanchez was present? Did Sanchez obtain it from somewhere in Hernandez's home? Did Sanchez go through Hernandez's trash? There is no evidence to support any of these scenarios. Indeed, although Hernandez described herself as "good friends" with Sanchez's mother, there is no evidence about what Hernandez meant by this: no evidence as to how often or where Hernandez saw Sanchez's mother, how long Hernandez had known Sanchez's mother, whether Sanchez herself was ever present at Hernandez's house, and so on. Thus, although we could speculate that Sanchez might have obtained the number from Hernandez and provided it to the forger, this speculation cannot rise to the level of an inference from the actual evidence presented at trial.

¶ 31     In considering the line between speculation and reasonable inference, we find helpful *People v. Davis*, 278 Ill. App. 3d 532 (1996). In that case, the appellate court reversed a jury's verdict that the defendant murdered his ex-wife. The only physical evidence linking the defendant to the crime was that he had, four years earlier, owned the gun that was probably used to kill his ex-wife. During the investigation, the gun was found in the Skokie lagoons; the defendant (who owned many other guns) testified at trial that he could not find the gun after returning from a shooting trip with friends four years earlier. The defendant presented an alibi (that he had been sleeping in the same room with his adolescent son at the time of the shooting), and no witnesses placed him near the scene of the crime. In addition, DNA analysis excluded the defendant as the source of the physical evidence found at the scene (semen, blood, and a hair).

¶ 32     The State argued that the defendant's ownership of the gun, coupled with a scenario the State sketched in which it would have been possible for the defendant to have shot his ex-wife, was sufficient to support the guilty verdict. However, the appellate court rejected this argument, noting that there was no evidence supporting the scenario sketched by the State. Acknowledging that the gun had been linked to the defendant (and that it would therefore be logical to conclude that the defendant used the gun to kill his ex-wife), the appellate court nevertheless reversed, stating:

"A reasonable inference within the purview of the law must have a chain of factual evidentiary antecedents. If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation." *Id.* at 540.

In the same way, without any evidence to support the theory that Sanchez actually obtained the social security number from Hernandez (or that her mother's friendship with Hernandez gave Sanchez the ability to know Hernandez's social security number), it remains speculation rather than a reasonable inference. This is true no matter how plausible the theory is, as the *Davis* court observed:

"It is easy to speculate that Davis killed [his ex-wife]. But a conviction based on speculation falls below the [line] that protects all of our citizens from losing their liberty except by proof beyond a reasonable doubt. Our oath of office demands that we disregard speculation ***. We must decide cases on proof in the record ***." *Id.* at 544.

Here, the record contains no evidence supporting the dissent's theory. Accordingly, the bare fact of Hernandez's friendship with Sanchez's mother cannot give rise to a reasonable inference that Sanchez knew that the social security number she used belonged to Hernandez.

¶ 33   The second piece of evidence highlighted by the dissent is Sanchez's statement to the police that she did not know Hernandez. While the inference that Sanchez was lying is not a *required* inference–it is possible that she failed to recognize that this fairly common name referred to her mother's friend or simply drew a blank on the name at that time–it is certainly a permissible inference, given Hernandez's friendship with Sanchez's mother. The record thus could support finding Sanchez's truthfulness impeached as to all of her statements, including her statement that she did not know that the number belonged to a real person. Indeed, although none of the trial court's comments indicates that it viewed Sanchez's testimony as self-serving or not credible, it ultimately found Sanchez guilty, thereby implicitly rejecting her testimony that she did not know that the social security number belonged to a real person.

¶ 34   Nevertheless, even if we disregard all of Sanchez's testimony, that does not amount to evidence that she *did* know that the number belonged to someone else. In other words, the fact that we do not believe her testimony would not mean that the State proved beyond a reasonable doubt that she had the necessary knowledge. It is well established under Illinois law that the State bears the burden of proving every element of the offense and that, "[t]o be sustained[,] the conviction must rest upon the strength of the People's case, not on the weakness of defendant's." *People v. Johnson*, 31 Ill. 2d 321, 324 (1964) (citing *People v. Coulson*, 13 Ill. 2d 290, 296 (1958)); see also *People v. Hodogbey*, 306 Ill. App. 3d 555, 562 (1999) ("That the jury may have disbelieved the testimony of defendant" will not overcome a lack of proof beyond a reasonable doubt that defendant had the necessary *mens rea*; reversing conviction).

¶ 35   The dissent asserts that Sanchez's statement that she did not know Hernandez was a false exculpatory statement, which is, in itself, evidence of consciousness of guilt. Statements or conduct indicating the defendant's consciousness of guilt may serve as circumstantial evidence supporting a conviction. For instance, in *People v. Milka*, 211 Ill. 2d 150, 181 (2004), the defendant repeatedly lied to police about his whereabouts during the time the crime was committed and attempted to create a false alibi. See also *People v. Hommerson*, 399 Ill. App. 3d 405, 410 (2010) (defendant gave police inconsistent accounts of his whereabouts during the crucial time, and defendant's wife later recanted the alibi she had

provided for defendant); Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 801.3, at 700 (9th ed. 2009) (conduct such as attempting to fabricate, suppress, or destroy evidence may demonstrate consciousness of guilt). No such statements or conduct occurred in this case, however. To the contrary, Corp testified that Sanchez freely admitted that she had used a social security number that was not hers, expressed a great deal of remorse, and was 100% cooperative. In light of Sanchez's confession and acceptance of responsibility, her statement that she did not know Hernandez cannot be seen as an attempt to evade criminal liability for her crime. In other words, it cannot be seen as implicit consciousness of guilt that is somehow more probative than her explicit admissions of guilt. Sanchez's entire interview with the police demonstrates that she knew she had done wrong in using a social security number that was not hers. What it does not show is that she knew that the number belonged to someone else. The dissent's focus on this denial presumes that, when Sanchez was interviewed by the police, she was aware that the State would have to prove she knew that the number belonged to someone else, and so she denied knowing Hernandez. There is simply no basis in the record for such a presumption.

¶ 36    The dissent also states that Sanchez did not contact Hernandez to apologize until almost a year after the police interview and suggests that this also reflects a consciousness of guilt. Again, it is unclear how any implicit "consciousness of guilt" is relevant or probative in the face of Sanchez's explicit confession of guilt. Moreover, this timeline is somewhat open to interpretation. Sanchez was interviewed by Corp on September 20, 2009, and was charged with identity theft on September 30, 2009. At trial, Hernandez testified that she first learned that it was Sanchez who had used her social security number when Sanchez contacted her. Counsel asked her, "And was this after she got arrested?" Hernandez replied, "Yes." We do not know whether, in responding this way, Hernandez was thinking of Sanchez's "arrest" as her police interview and being charged with a crime, both of which occurred in September 2009, or the actual arrest, which apparently occurred almost a year later. Even if it was the latter, however, we do not see how this fact establishes that Sanchez knew, at the time she used the number, that it belonged to Hernandez.

¶ 37    The dissent also describes in great detail the various documents on which Sanchez wrote the social security number during the process of applying for a job and beginning to work. However, the fact that there were several such documents is not probative of the issue at hand, which is whether Sanchez knew at the time she used the number that it belonged to a real person. Some of the federal cases decided since *Flores-Figueroa* hold that repeatedly using personal identifying information after the defendant has "tested" the authenticity of that information can show that, at the time of the later uses, the defendant believed that the information belonged to a real person and would withstand scrutiny. See *United States v. Valerio*, 676 F.3d 237, 244 (1st Cir. 2012) (affirming identity theft conviction based in part on fact that defendant used the social security number repeatedly, first to obtain a state driver's license, "knowing that the number would be verified" with the Social Security Administration); see also *United States v. Holmes*, 595 F.3d 1255 (11th Cir. 2010) (where defendant first used victim's social security number to successfully obtain a passport, she must have known that the authenticity of the number had been subjected to stringent verification during that process, and thus the jury could reasonably find that she knew that

-11-

the number belonged to a real person when she used the same number later to get a driver's license), and its progeny, including *United States v. Gomez-Castro*, 605 F.3d 1245 (11th Cir. 2010), and *United States v. Doe*, 661 F.3d 550, 561-63 (11th Cir. 2011) (explaining *Holmes* and *Gomez-Castro*). Those cases are inapposite here, where all of the documents on which Sanchez wrote the number were executed on one of two dates only a few months apart, and there was no evidence supporting an inference that Atlas Staffing would subject the number to stringent verification procedures during the interim. (Indeed, from the record, it does not appear that Atlas Staffing ever attempted to verify the authenticity of the number.) In *United States v. Gaspar*, 344 F. App'x 541, 546 (11th Cir. 2009), the court noted that in *Flores-Figueroa* the defendant was employed for six years using the social security number he obtained, and it commented that, "[a]s that case demonstrates, an individual can successfully use documents that do not belong to a real person in order to secure benefits such as employment, even though employers also presumably run background checks."

¶ 38     Finally, the dissent argues that post-*Flores-Figueroa* cases have considered the fact that the defendant and the victim knew each other as evidence that the defendant knew that the information he or she used belonged to a real person. *Infra* ¶ 75. The dissent points to *United States v. Tureseo*, 566 F.3d 77 (2d Cir. 2009), and *Gaspar*, as well as *Holmes* and *Valerio*. However, these cases do not support the dissent's argument. In *Tureseo*, the Second Circuit found that the trial court had erred by not requiring the government to prove that Tureseo knew that the personal information he used belonged to another person, and it remanded for a new trial because there was conflicting evidence about whether Tureseo knew that the victim existed. *Tureseo*, 566 F.3d at 86. Similarly, in *Gaspar*, the appellate court reversed the conviction because there was no evidence that Gaspar knew of the victim's existence (let alone knew the victim herself). *Gaspar*, 344 Fed. App'x at 546. Nor was there any evidence in either *Holmes* or *Valerio* that the defendants in those cases actually knew the persons whose identifying information they were using.

¶ 39     In sum, while we attach great weight to the findings of the trial court, those findings are not impervious to review and must be based on evidence. *People v. Jakes*, 207 Ill. App. 3d 762, 770 (1990). "Suspicious conduct or probabilities cannot substitute for proof ***." *Id.* Moreover, "the reviewing court has the duty to set aside a conviction where the evidence is such" that any element of the crime is not proved beyond a reasonable doubt. *Id.* Here, there simply is no evidence from which we could find that Sanchez knew that the number belonged to "another person." Accordingly, Sanchez's conviction for identity theft cannot be sustained. 720 ILCS 5/16G-15(a)(1) (West 2010); *Hernandez*, 2012 IL App (1st) 092841, ¶ 39.


¶ 40                                    Lesser Included Offense
¶ 41     Recognizing the possibility that Sanchez's conviction could be reversed, the State asks that, if we find that there was insufficient evidence of criminal intent, we reduce the conviction to a lesser included offense, possessing a fraudulent identification card (15 ILCS 335/14B (West 2010)). "It is well established that a defendant may be convicted of an offense not expressly included in the charging instrument if that offense is a lesser-included

-12-

offense of the crime expressly charged." *People v. Rowell*, 229 Ill. 2d 82, 97 (2008). Pursuant to Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967), a reviewing court may reverse a conviction on a greater offense and at the same time order the entry of a conviction on a lesser included offense. *Rowell*, 229 Ill. 2d at 97 (citing *People v. Knaff*, 196 Ill. 2d 460, 477-78 (2001)).

¶ 42    A lesser-included-offense analysis involves two inquiries. *People v. Echols*, 382 Ill. App. 3d 309, 313 (2008). The first is whether the particular offense is indeed a lesser included offense of the charged offense. Under the charging instrument approach, we must examine whether the factual description of the charged offense "describes, in a broad way, the conduct necessary for the commission of the lesser offense and any elements not explicitly set forth in the indictment can reasonably be inferred." *People v. Kolton*, 219 Ill. 2d 353, 367 (2006). This inquiry presents a question of law. *Id.* at 361. The second inquiry is whether the evidence presented at trial would rationally support a conviction on the lesser included offense. *Echols*, 382 Ill. App. 3d at 314.

¶ 43    In this case, the indictment charged that Sanchez "knowingly used personal identification information of another, being a social security number belonging to Maria G. Hernandez." The offense that the State urges us to consider as a lesser included offense is possessing a fraudulent identification card (15 ILCS 335/14B (West 2010)). That provision makes it a Class 4 felony for any person to "knowingly possess, display, or cause to be displayed any fraudulent identification card." 15 ILCS 335/14B(b)(1) (West 2010).

¶ 44    Under the first step in the lesser-included-offense analysis, we find that some but not all of the elements of the lesser offense are "described, in a broad way," in the indictment. For instance, the *mens rea* is the same: both offenses require that the defendant acted "knowingly." Further, any reasonable reading of the charged offense's element of "use" would fairly encompass the lesser offense's element of possession. The difficulty arises because of the difference between the indictment's focus on "personal identification *information*, being a social security *number*" and the lesser offense's requirement that the defendant possessed an actual physical item, a fraudulent identification *card*. (Emphasis added.) This requirement of a physical item is an additional element not contained in the charge. The State has cited no authority for the proposition that alleging that a defendant used particular information encompasses that the defendant possessed a particular physical item. Because of the difference in the elements of the two offenses, we conclude that the language of the indictment (use of a number or information) does not describe, even in a broad way, the offense of possessing a card, or a physical item. Accordingly, under the language of the indictment, possessing a fraudulent identity card is not a lesser included offense of identity theft. We therefore may not substitute a conviction on the proposed lesser included offense but instead must reverse Sanchez's conviction outright.

¶ 45    As we have determined that we must reverse the conviction due to the State's failure to prove the necessary *mens rea*, we need not address Sanchez's other arguments.


¶ 46                                CONCLUSION

¶ 47    We acknowledge that cases like this one, in which a defendant contends that she did not

-13-

know that the social security number she used belonged to a real person, present the State with a difficulty in proving the offense of identity theft. The Supreme Court itself recognized this in *Flores-Figueroa*, commenting that, although the necessary *mens rea* would be relatively easy to prove in the classic types of identity theft where the personal identifying information was acquired by means such as skimming of credit card numbers by a store clerk, dumpster-diving, or computer hacking, criminal knowledge that the information belonged to a real person would be harder to prove in a case in which an illegal immigrant simply used information to obtain employment:

> "Take an instance in which an alien who unlawfully entered the United States gives an employer identification documents that *in fact* belong to others. How is the Government to prove that the defendant *knew* that this was so? The Government may be able to show that such a defendant knew the papers were not his. But perhaps the defendant did not care whether the papers (1) were real papers belonging to another person or (2) were simply counterfeit papers." (Emphases in original.) *Flores-Figueroa*, 556 U.S. at 655-56.

In this case, the State encountered this very problem of proof. That problem may be addressed by presenting more evidence on the issue of knowledge than was presented here–in this respect, the State was handicapped in this case by its earlier position that it did not need to prove that Sanchez knew that the social security number she used belonged to a real person. Or, if further evidence is not available, the State may choose to charge a defendant with the use of false papers rather than identity theft. There may be still other possible remedies for this problem of proof. However, in this case, the State did not prove that Sanchez possessed the necessary *mens rea* and thus her conviction cannot stand. We reverse Sanchez's conviction of identity theft (720 ILCS 5/16G-15(a)(1) (West 2010)).

¶ 48    Reversed.

¶ 49    JUSTICE BIRKETT, dissenting.

¶ 50    I respectfully dissent. I agree with my colleagues that we should adopt the reasoning of the Supreme Court of the United States in *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), and the First District's decision in *People v. Hernandez*, 2012 IL App (1st) 092841. However, I disagree with my colleagues that the evidence in this case does not support a finding that defendant knew that the social security number belonged to "another person." The majority simply accepts defendant's statement that she did not know that the number belonged to another, ruling that the "only direct evidence in the record on this issue is Sanchez's own testimony that she thought the number was a 'random,' unassigned number, and did not know that it belonged to another person." *Supra* ¶ 22. The majority has ignored the Illinois Supreme Court's admonishment that " 'a reviewing court *must* allow all reasonable inferences from the record in favor of the prosecution.' " (Emphasis added.) *People v. Cardamone*, 232 Ill. 2d 504, 511 (2009) (quoting *People v. Bush*, 214 Ill. 2d 318, 326 (2005)). The majority also notes that the trial court did not state a finding that defendant was not credible. See *supra* ¶ 33. First, the trial court is not required to state its findings. *People v. Mandic*, 325 Ill. App. 3d 544, 546-47 (2001). Second, the trial court, by finding

defendant guilty, rejected her statement that she did not know that the number belonged to another person. The majority says that it agrees that knowledge is ordinarily proven by circumstantial evidence, but then goes on to say that a conviction cannot be sustained here because "none of the evidence–circumstantial or otherwise–demonstrates that Sanchez knew that the number belonged to someone else." *Supra* ¶ 25. The majority explains the basis for this finding earlier in its opinion by rejecting the inferences of guilty knowledge that the State argues flow from the fact that defendant paid for the number and the fact that defendant was successful in getting the job that she kept for a year and a half. The majority forgets that it is up to the trial court to judge the credibility of the witnesses, to determine what weight is to be accorded their testimony, to decide the inferences to be drawn from the evidence, and to resolve any conflicts in the evidence. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996) (citing *People v. Reid*, 136 Ill. 2d 27, 61 (1990)). Defendant's statement that she did not know that the number belonged to another person *was* contradicted by the facts and circumstantial evidence. The credibility of defendant's statement to Detective Corp and her trial testimony were for the trial court to decide. The majority is not entitled to substitute its judgment for that of the trial court. *People v. Woods*, 81 Ill. 2d 537, 542 (1980). Defendant's trial testimony that she bought the number from "a random guy" and that she believed that it was an "unassigned" number was considered by the trial court. In weighing defendant's exculpatory statement to Corp, the trial court considered the probability of defendant's version in light of the circumstances and the testimony of other witnesses. See *People v. Simon*, 2011 IL App (1st) 091197, ¶ 54.

¶ 51    My colleagues forget that the *Collins* standard of review "does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009) (citing *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992) (quoting *People v. Campbell*, 146 Ill. 2d 363, 375 (1992))). My colleagues accept the "coincidence" explanation for the fact that the social security number turned out to belong to a close friend of defendant's mother, saying that "such a coincidence is not so inherently improbable that it must be rejected as a matter of common sense." *Supra* ¶ 28. Again, the majority forgets that "the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Jackson*, 232 Ill. 2d at 281 (citing *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007)). Where a defendant chooses to give an explanation for his or her conduct, he or she should provide a reasonable story or be judged by its improbabilities. *People v. Hart*, 214 Ill. 2d 490, 520 (2005) (citing *People v. Shevock*, 335 Ill. App. 3d 1031, 1037-38 (2003)); *People v. Nyberg*, 275 Ill. App. 3d 570, 579 (1995).

¶ 52    In *Hart*, at the conclusion of a jury trial the defendant was convicted of armed robbery and aggravated fleeing or attempting to elude a police officer. At trial, the defendant presented an alibi through his girlfriend's and his own testimony. After carefully examining the evidence, the supreme court concluded that "[t]he story defendant told the jury was simply unbelievable." *Hart*, 214 Ill. 2d at 520. A careful review of the evidence in this case leads me to the same conclusion regarding defendant's claim that she did not know that the social security number belonged to another person. The trial court was not required to accept

defendant's version that it was by "coincidence" that the number turned out to belong to her mother's "extremely close friend."

¶ 53    The majority's reliance on *People v. Davis*, 278 Ill. App. 3d 532 (1996), is misplaced. See supra ¶ 31. In *People v. Hommerson*, 399 Ill. App. 3d 405, 411 (2010), this court distinguished *Davis*, saying:

> "Defendant's reliance on *People v. Davis*, 278 Ill. App. 3d 532 (1996), is misplaced. In *Davis*, the defendant was convicted of murdering his ex-wife. The only evidence presented linking the defendant to the murder was the handgun used, which the defendant owned and possessed four years before the murder. In reversing the conviction, the appellate court found that the State did not rebut the testimony that the defendant last saw the handgun four years before the murder. *Davis*, 278 Ill. App. 3d at 540. The court further held that the State's inferences that the defendant had the opportunity to commit the crime and that he was the person who fired the handgun at the time of the homicide were based on mere speculation. *Davis*, 278 Ill. App. 3d at 541."

¶ 54    In *Davis*, the appellate court stated that "[n]obody saw or heard Davis do any of the things alleged by the State." *Davis*, 278 Ill. App. 3d at 541. That, of course, is not the case here. Defendant admits everything alleged by the State except knowing that the number she used belonged to another person.

¶ 55    The majority dismisses defendant's denials that she knew Hernandez, saying that "it is possible that she failed to recognize that this fairly common name referred to her mother's friend or simply drew a blank on the name at that time." *Supra* ¶ 33. The majority acknowledges that false exculpatory statements may give rise to an inference of guilt. *Supra* ¶¶ 35, 36. The majority then goes on to explain why it does not view defendant's statements to Corp that she did not know Hernandez as false exculpatory statements. It concludes that, because defendant otherwise admitted her guilt, "her statement that she did not know Hernandez cannot be seen as an attempt to evade criminal liability for her crime." *Supra* ¶ 35. The majority cites no authority for this proposition. It is a matter of common knowledge that people in all sorts of situations minimize their wrongdoing when confronted. As Hernandez testified, defendant had never been given permission to use her social security number. This fact alone explains the lie and also sheds light on the "random guy" story.

¶ 56    My colleagues also state that my focus on the denial "presumes" that defendant was aware that the State would have to prove that defendant knew that the number belonged to another person. I do not presume anything with respect to defendant's false statements. My focus is on what a rational trier of fact could conclude based on this evidence. *People v. Kirchner*, 2012 IL App (2d) 110255, ¶ 11. It was the province of the trial judge to resolve conflicts in the evidence and to determine the credibility of the witnesses. *People v. Brown*, 2012 IL App (2d) 110640, ¶ 17. Again, the majority is reweighing the evidence, which our supreme court has repeatedly admonished us not to do. *Jackson*, 232 Ill. 2d at 280-81.

¶ 57    The majority is conveniently selective in its discussion of the evidence in this case. For example, while the background section of the opinion notes that during her recorded interview with Corp defendant denied knowing Hernandez, the majority ignores this fact in its analysis. During the recorded interview, Corp referenced an earlier unrecorded interview,

repeating defendant's statement that she did not know Hernandez. At the end of the recorded interview, defendant was asked what she would say to Hernandez in her own words. Instead of saying that she knew Hernandez and would contact her to apologize, defendant continued the charade and said she was "extremely sorry," etc. A false exculpatory statement is " 'probative of defendant's consciousness of guilt.' " *People v. Milka*, 211 Ill. 2d 150, 181 (2004) (quoting *People v. Shaw*, 278 Ill. App. 3d 939, 951 (1996)). The trial court could infer that defendant denied knowing Hernandez because she knew all along that the social security number belonged to Hernandez. Defendant told Corp that she would like to apologize to Hernandez. Hernandez testified that she was "extremely good friends" with defendant's mother and that she knew defendant and her family. Defendant's recorded interview with Corp was on September 20, 2009. Even though she lied about knowing Hernandez, one would expect that a person with an innocent frame of mind (who did not know that the number belonged to another person) would have immediately contacted the victim to apologize and relieve her concerns. Hernandez testified that she learned after defendant's arrest, when defendant called her, that defendant had used her social security number. Defendant was not arrested until September 1, 2010, and posted bail on September 2, 2010. The fact that defendant waited a year to call Hernandez and did so only after her arrest in September 2010, taken together with the other evidence, allowed the inference that defendant knew all along that the number belonged to Hernandez.

¶ 58    The majority rejects the inferences of guilt that flow from defendant's failure to contact and apologize to Hernandez for almost a year. It asserts that "[the] timeline is somewhat open to interpretation." *Supra* ¶ 36. I disagree. First, Hernandez was answering questions put to her by defense counsel. There was no confusion. Second, at oral argument defense counsel said that defendant called Hernandez *after* she saw Hernandez's name on the complaint. Again, they are reweighing the evidence.

¶ 59    The majority acknowledges the well-established principle that knowledge is ordinarily proven by circumstantial evidence. However, the majority's focus is limited to the points raised by the State. *Supra* ¶ 23. When reviewing the sufficiency of the evidence, we examine whether *all* the evidence taken together could satisfy the trier of fact beyond a reasonable doubt of the accused's guilt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59. "The trier of fact, however, need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *Id.* ¶ 60 (citing *People v. Campbell*, 146 Ill. 2d 363, 380 (1992)).

¶ 60    It is a well-settled principle that "where the evidence presented is capable of producing conflicting inferences, the matter is best left to the trier of fact for proper resolution." *Campbell*, 146 Ill. 2d at 380 (citing *Publication Corp. v. Chicago River & Indiana R.R. Co.*, 49 Ill. App. 3d 508, 514 (1977)). In ruling on defendant's motion for a directed finding, the trial court referred to the facts that defendant "paid someone for information" and that "[i]t was successful in allowing employment." Based upon this evidence the trial court denied the motion. There is no question that, unlike the trial courts in *Hernandez* and *Flores-Figueroa*, the trial court in the instant case required the State to prove that defendant knew that the social security number belonged to another person. The majority does not say that the inferences made by the trial court are unreasonable. Instead, the majority asserts that there is another inference, that "it could have been a made-up number." *Supra* ¶ 24. First, it is

-17-

improper for a reviewing court to draw its own inferences from facts that were considered by the trial court unless the trial court's inferences were completely unreasonable. Second, the majority's assertion relies on a fiction because defendant never said that it was a made-up number. Instead, she testified that she believed that the number was a random, unassigned number that she purchased. There is no such thing as an unassigned social security number. There are real numbers, which are issued to people, and made-up numbers. It is a matter of common knowledge that social security numbers are issued by the United States Social Security Administration to people who are either United States citizens or eligible aliens. See 20 C.F.R. § 422.107 *et seq.* (2010).

¶ 61    The Social Security Administration's website explains that only three types of social security cards are issued: (1) cards with the card owner's name and social security number, which are issued to United States citizens and people lawfully admitted to the United States on a permanent basis; (2) cards with the card owner's name and social security number and the note "VALID FOR WORK ONLY WITH DHS AUTHORIZATION," which are issued to people lawfully admitted to the United States on a temporary basis with work authorization from the Department of Homeland Security (DHS); and (3) cards with the card owner's name and social security number listed and the note "NOT VALID FOR EMPLOYMENT," which are issued to people who are lawfully admitted to the United States without work authorization from DHS, but with a valid nonwork reason for needing a social security number or who need a number because of a federal law requiring a social security number to get a benefit or service. See http://socialsecurity.gov/pubs/10002.html#a0=2 (last visited June 7, 2013).

¶ 62    Defendant testified that she found out in high school that in order to take "driver's ed" and get a driver's license she had to get a social security number. Defendant explained that she found out that she could not get a social security number because of her "immigration status." It was entirely reasonable for the trial court to infer that defendant knew how and to whom social security numbers may be issued.

¶ 63    The majority implies that defendant's testimony was consistent with what she told Corp. Even if this were true, the trial court was free to accept or reject both explanations as to how she obtained the social security number. On Corp's cross-examination, the following exchange occurred:

> "Q. I don't think I heard it in the taped statement, but she did tell you that she did not steal this number; that she thought it was a random unassigned number when she purchased it, correct?
>
> A. That's what she advised me, yes."

¶ 64    As the majority noted, in the recorded interview, Corp "referred to Sanchez having previously told him *certain* things." (Emphasis added.) *Supra* ¶ 8. In the recorded interview defendant was asked:

> "DETECTIVE CORP: And this Social Security number, you don't know *who* it belonged to?
>
> DEFENDANT: No, I don't." (Emphasis added.)

¶ 65    It was reasonable for the trial court to conclude that defendant did not tell Corp that she

thought the number was "unassigned," because the clear inference from the taped interview is that she knew that it belonged to someone, she just denied knowing "who" that someone was.

¶ 66    Defendant's trial testimony regarding how she obtained the social security number was as follows:

"Q. [Defense Counsel:] At some point in time, did you obtain a Social Security number that was not your social security number?

A. Yes.

Q. And how did that process occur?

A. Usually, there's like people that–I didn't really know the person. It was just somebody that basically hands out sort of phony business cards, and they tell you what they're pretty much doing.

Q. Now, so did you get a Social Security number that's, that we're talking about in this case, is that the Social Security number that you got?

A. Yes.

Q. Who did you get it from?

A. It was from a random guy. I really don't know who the guy was.

THE COURT: Sorry, I did not hear what you said.

A. [Defendant:] It was from a random guy that–

THE COURT: Random guy, that was your word. Thank you. Go ahead.

A. We, we wanted to go ahead and use him to help me out with the Social Security issue.

Q. [Defense Counsel:] And do you remember when it was when you did that?

A. No.

Q. Okay. At some point before applying for the job at Atlas?

A. Yes.

Q. Now what was your situation–when you got that Social Security number, were you given any kind of representations about who it belonged to or anything?

A. No, sir.

Q. What was your belief regarding the Social Security number?

A. Just a random number.

Q. Did you believe that it was assigned to anybody?

A. No.

Q. So it was your belief that it was an unassigned number?

A. Yes."

¶ 67    The trial court had to weigh this cryptic description against the other evidence in this case in determining whether defendant's testimony was believable. Defendant did not explain to whom she was referring when she said "we wanted to go ahead and use him to help me out

with the Social Security issue." At the conclusion of the trial testimony, the trial court recessed and explained to the parties that it wanted to read the case law and "also look at the exhibits more closely." A close examination of the State's exhibits supports the trial court's finding that defendant knew that the social security number belonged to another person.

¶ 68 The three categories of eligibility for issuance of a social security number/card are listed on State's Exhibit 1, the employment eligibility verification that defendant filled out and signed on January 8, 2008, during the process of applying for a job at Atlas. The form is issued by the DHS/United States Citizenship and Immigration Service. Defendant provided her name, address, and date of birth, and she filled in Hernandez's social security number in the box provided for the applicant's number. The form also has a space with three boxes to designate which category the applicant falls into. It provides:

"I attest under penalty of perjury, that I am (check one of the following):

▫ A citizen or national of the United States

▫ A lawful Permanent Resident (Alien) _____

▫ An alien authorized to work until _____

(Alien # or Admission #) _____ "

¶ 69 Defendant checked the first box, "A citizen or national of the United States." Hernandez testified that she lived her "entire life" in the city of Aurora, making her a United States citizen. The trial court could have reasonably inferred that defendant falsely claimed that she was a United States citizen because she knew that the number belonged to Hernandez, who is a United States citizen. Above defendant's signature on this form is the statement, "I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form." By her own admission, defendant made false statements and used false documents in connection with the completion of the form. On the form, defendant listed the two documents that she acknowledged were counterfeit, the "I.D. card, State of Illinois # xxxx xxxx xxxx exp. 6-6-11" and "Social Security Card. Social Security Administration # xxx xx xxxx N/A."

¶ 70 State's Exhibit 2 is Form W-4 (2006), which defendant filled out on January 8, 2008. This form explains that its purpose is "so that your employer can withhold the correct federal income tax from your pay." Defendant listed no exemptions. It appears that she initially checked the box indicating "Married," but then scratched that out and checked "Single" on the form. She signed this form under penalty of perjury as well. Likewise, defendant filled out State's Exhibit 3, a 2006 Form W-5. That form states, "[u]se this form if you are eligible to get part of the earned income credit (EIC) in advance with your pay and choose to do so." Defendant made the same mistake on this form, first checking "Married filing jointly" and then checking "Single, head of household, or qualifying widow(er)." On this form, defendant again used Hernandez's social security number and signed under penalty of perjury on January 8, 2008.

¶ 71 State's Exhibit 4 is a "Release of Criminal Records," which defendant filled out and signed on January 8, 2008. She provided her own address and date of birth (June 6, 1989) and Hernandez's social security number. This form granted Atlas the authority to "examine any and all criminal records and arrests on file in the counties of the State of Illinois or any

other state."

¶ 72    On March 24, 2008, the date defendant began working for Atlas, she filled out two more forms, both Form W-4 (2008), State's Exhibits 5 and 6. On one of these forms defendant claimed two exemptions and on the other she claimed four exemptions. On both forms defendant again used Hernandez's social security number and signed under penalty of perjury.

¶ 73    State's Exhibit 8 is a three-page computer-generated document titled, "Atlas Staffing-Aurora-Payroll Summary-Sanchez, Miriam." There are 20 columns, each column reflecting various payroll information, including the check number, net pay, and various withholdings from defendant's paycheck for the 70 pay periods for which defendant received checks, from March 26, 2008, to November 4, 2009. Each pay period reflects withholdings for federal and state income tax as well as the Federal Insurance Contributions Act tax (FICA), the tax imposed on employees to fund Social Security and Medicare. The payroll record reveals that defendant received a check with a net pay of $72.16 on November 4, 2009, nearly two months after Corp interviewed defendant. The majority does not explain how this fact jibes with its conclusion that the evidence was insufficient to prove that defendant knew that the number belonged to another person while she was fraudulently benefitting from its use.

¶ 74    State's Exhibit 7 is a photocopy of the counterfeit social security card and the counterfeit State of Illinois identification card, bearing Secretary of State Jesse White's name, defendant's identifiers, including her name, height, weight, eye color, address, date of birth, and photograph. The date of birth is the date testified to by defendant and the address matches the address defendant gave to Atlas. The photograph is clearly of defendant, who attended oral argument in this case. From this evidence is a clear inference that defendant provided the identifiers to a counterfeiter who then created these documents for a fee. Despite defendant's testimony to the contrary, it is a reasonable inference that defendant provided the social security number along with her own identifiers, especially in light of the fact that defendant and Hernandez knew each other. It is simply beyond belief that defendant provided all the information except for the social security number.

¶ 75    The majority relies on *Flores-Figueroa* and *Hernandez* for the proposition that the State was required to prove that defendant knew that the "personal identifying information" belonged to another person at the time of the use in order to prove identity theft pursuant to section 16G-15 of the Criminal Code of 1961. See 720 ILCS 5/16G-15(a)(1) (West 2010). In both *Flores-Figueroa* and *Hernandez*, the trial courts rejected the defendants' arguments that they could not be convicted of identity theft because the government did not prove that the defendants knew that the information belonged to another person. *Flores-Figueroa*, 556 U.S. at 650; *Hernandez*, 2012 IL App (1st) 092841, ¶ 19. The convictions in both cases were reversed and the cases were remanded, for further proceedings in *Flores-Figueroa* and for a new trial in *Hernandez*. *Flores-Figueroa*, 556 U.S. at 657; *Hernandez*, 2012 IL App (1st) 092841, ¶ 83.

¶ 76    The majority states that the State had a proof problem like the one encountered by the government in *Flores-Figueroa* and that it was "handicapped" by "its earlier position" that it did not have to prove that defendant knew that the number belonged to a real person. *Supra*

¶ 47. On the contrary, the record reflects that the State argued that it had proven the element of defendant's knowledge that the number belonged to another. The State cited *People v. Montoya*, 373 Ill. App. 3d 78 (2007), and pointed out that in that case "there was no evidence that the defendant knew that Cantu (the victim) was a real person." The State argued that, although it did not believe that knowledge that the number belonged to another was an element, defendant's knowledge that the number belonged to another "could be inferred" from the facts of this case.

¶ 77    There was no evidence in either *Flores-Figueroa* or *Hernandez* that the defendant knew the victim, *i.e.*, the person to whom the social security number belonged. Likewise, neither case involved evidence that the defendant paid money to another person to purchase the social security number. In *Hernandez*, the State introduced the defendant's statement that "she made up the number." *Hernandez*, 2012 IL App (1st) 092841, ¶ 70. The defendant introduced evidence from the victim "that she had never met defendant and did not know anyone by the name of [the defendant]." *Id.* In *Hernandez*, the State noted that the trial court asked defense counsel, " 'what if the statement she gave to the police that it was a made-up number is viewed as a self-serving statement and not to be believed whether it was somebody's number?' " *Id.* The State also argued that the defendant had furnished two social security numbers and noted that there are one billion possible combinations of nine-digit numbers, yet " '[d]efendant nonetheless claims that she pulled [the victim's] number out of the ether.' " *Id.* The appellate court found that the State's evidence against the defendant was not overwhelming and that therefore "[i]t is not clear beyond a reasonable doubt that the trier of fact 'would have found the defendant guilty absent the error [by the trial court concerning its understanding of the knowledge element].' " *Id.* ¶ 71 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). In this case, there was no such error. In ruling on defendant's motion for a directed finding, the court stated, "[t]he statute refers to using–knowingly using personal identifying information or personal identifying documents of another person." Unlike in *Flores-Figueroa* and *Hernandez*, the evidence in this case is not close on the issue of whether the State proved that defendant knew that the number she used belonged to another person.

¶ 78    Several cases since *Flores-Figueroa* are instructive on the issue of sufficiency of proof regarding knowledge that a social security number belonged to another person. In *United States v. Holmes*, 595 F.3d 1255, 1258 (11th Cir. 2010), the court found the evidence sufficient when the defendant was willing to subject the victim's number to repeated government scrutiny, using it to obtain a driver's license and a line of credit. In the instant case, defendant filled out tax forms on two different dates, agreed to a criminal background check listing Hernandez's number, and received 70 paychecks with federal and state taxes withheld under Hernandez's number.

¶ 79    In *United States v. Valerio*, 676 F.3d 237 (1st Cir. 2012), the defendant entered the United States illegally from Costa Rica in 1991. Her companion paid $500 to obtain a birth certificate and a social security card in the name of the victim. *Id*. at 241. The defendant used that identity to hold a variety of jobs from 1995 to 2007, to pay taxes, and to open lines of credit. *Id.* In 2006, the victim learned that someone had used her social security number to open up numerous lines of credit. The victim filed a police report and the defendant was

-22-

arrested and charged with three counts of mail fraud and aggravated identity theft pursuant to section 1028A of title 18 of the United States Code. 18 U.S.C. § 1028A (2006). A jury convicted the defendant, and on appeal she argued that there was no direct evidence that she knew that the victim was a real person or that she knew anything about the origin of the documents. She also pointed out that "both she and [the victim] testified that neither of them knew the other." *Valerio*, 676 F.3d at 244. The First Circuit rejected this argument and found that there was sufficient circumstantial evidence that the defendant knew that the victim was a real person where the defendant had the victim's credit reports and birth certificate.

¶ 80    In *United States v. Tureseo*, 566 F.3d 77 (2d Cir. 2009), following *Flores-Figueroa*, the Second Circuit vacated a conviction of aggravated identity theft where the trial court refused to instruct the jury that to convict the defendant of aggravated identity theft the jury was required to find that the defendant knew that the identity belonged to another person. *Id.* at 86. The government argued that the error was harmless beyond a reasonable doubt because there was sufficient circumstantial evidence for any reasonable jury to conclude that the defendant was "assuming" an alternate identity. *Id.* The court of appeals observed:

> "Although there appears to be substantial evidence for the jury to conclude that Tureseo knew that Ortega was an actual person at the time he used Ortega's birth certificate to falsely claim United States citizenship, the evidence does not all flow in one direction. For example, the jury was also presented with Ortega's testimony that he had never met or seen Tureseo before the trial, thus suggesting that Tureseo did not know of Ortega's existence at all. Therefore, we cannot conclude that the District Court's improper jury instructions were harmless beyond a reasonable doubt, and the District Court's judgment of conviction with regard to aggravated identity theft cannot stand." *Id.* at 86.

¶ 81    Likewise, in *United States v. Gaspar*, 344 F. App'x 541 (11th Cir. 2009), the Eleventh Circuit reversed a conviction of identity theft because the government failed to prove that the defendant knew that the birth certificate she used belonged to "another actual person." *Id.* at 543. The trial in *Gaspar* took place before *Flores-Figueroa* was decided by the Supreme Court. In reversing the defendant's conviction, the circuit court noted that there was no evidence that the defendant knew that the victim existed when she used the birth certificate to obtain a passport. The court said that "there is no evidence that Gaspar ever met or spoke with C.T. (who was born in Texas), or that the co-worker who sold the birth certificate to Gaspar in Tennessee mentioned C.T. was a real person." *Id.* at 546.

¶ 82    These cases support the proposition that, when the evidence establishes that the victim and the defendant know each other, it is perfectly reasonable to infer that the defendant knew that the personal identifying information belonged to another person. In order to draw this inference, it is not necessary for the State to prove exactly how the defendant acquired the information.

¶ 83    The majority questions how the evidence establishes that defendant "acquired the number from the victim without her knowledge." *Supra* ¶ 30. Just as in a case involving recent possession of stolen property, the State was not required to prove precisely how defendant came into possession of the number to prove knowledge that it belonged to another person. It was up to the trial court, not this court, to determine whether defendant's "random guy"

-23-

story was believable. A defendant who chooses to explain his possession of stolen property must offer a reasonable story, or be judged by its improbabilities. *People v. Daniels*, 113 Ill. App. 3d 523, 531 (1983). How did defendant obtain Hernandez's number? It is a matter of common knowledge that when visiting the homes of very close friends people sometimes leave purses, jackets, and the like unattended in rooms that are accessible to others in the home.

¶ 84 With regard to the unlawful use of an identification card (15 ILCS 335/14B (West 2010)), I agree with the majority that this offense is not a lesser included offense of identity theft as charged in the indictment. However, the majority should never have reached this issue. In affirming defendant's conviction, I would have addressed defendant's argument that the necessity defense was wrongly interpreted by the trial court. The trial court could have refused to even consider the defense of necessity, because defendant did not admit that she committed the "offense," which includes the requisite mental state. Necessity, like entrapment, is not available to a defendant who denies the commission of the offense. See *People v. Landwer*, 166 Ill. 2d 475, 477-95 (1995); *People v. Gengler*, 251 Ill. App. 3d 213, 222 (1993). The trial court considered the defense because defendant admitted committing "the illegal act." Assuming this is enough to invoke necessity, I conclude that the trial court ruled correctly on the merits. There was no proof that defendant was faced with a "specific and immediate threat" of harm. *People v. Kite*, 153 Ill. 2d 40, 46 (1992).

¶ 85 It appears to me that defense counsel used the defense of necessity, in part, to make an emotional appeal to the trial court. He argued, "[t]his is the only country she knows, judge, and this conviction is going to have such a devastating effect on her life ***. *** I'm asking the court to look at it with some empathy." I do not doubt that counsel believed that necessity was an available defense. That could explain why defendant apparently rejected a plea offer that a minute order reflects was conveyed to counsel on November 5, 2010. In ruling on defendant's motion for a new trial, the trial court correctly reminded the parties that "this is not about personal opinions." The court made clear that it was ruling on the evidence and the law as applied to the evidence, which is what we must also do.

¶ 86 The majority suggests that the State's proof problem "may be addressed by presenting more evidence on the issue of knowledge" and then suggests that the State "may choose" another charge. *Supra* ¶ 47. In these circumstances I cannot imagine what additional evidence the State could have assembled. Also, while I believe that it might be appropriate to comment on the weaknesses of the evidence in a case where reversal is required, we should not be providing charging advice to the State. That matter is in its sole and exclusive discretion. The State might not have argued the facts of the case as thoroughly or effectively as it could have; however, there was no "problem of proof." Defendant's lies about not knowing Hernandez, and the "random unassigned number" from "a random guy" stories, are preposterous.

¶ 87 After reviewing the evidence in the light most favorable to the State, I conclude that the trial court could have found the essential elements of identity theft beyond a reasonable doubt. I would also find that the necessity defense does not apply.