2024 IL App (1st) 221140-U

FIFTH DIVISION
May 31, 2024

No. 22-1140

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 02077 |
| | ) | |
| JAMAR BROWN, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for aggravated unlawful use of a weapon based, in part, on his failure to have a currently valid firearm owner's identification card is vacated, where the State failed to prove beyond a reasonable doubt that defendant knew his card had been revoked.

¶ 2    Following a bench trial, defendant Jamar Brown was convicted of one count of aggravated unlawful use of a weapon (AUUW) and sentenced to 16 months in prison. On appeal, Mr. Brown argues his conviction should be reversed because (1) the State failed to prove beyond a reasonable doubt that he knew his firearm owner's identification (FOID) card had been revoked and (2) the

section of the AUUW statute under which he was convicted is facially unconstitutional.

¶ 3    For the reasons that follow, we vacate in part and remand with directions.

¶ 4                              I. BACKGROUND

¶ 5    The State charged Mr. Brown with several firearm offenses, in connection with a traffic stop that occurred on January 24, 2021. Count 1 charged him with possessing a firearm with a revoked FOID card, in violation of the Firearm Owners Identification Card Act (430 ILCS 65/2(a)(1) (West 2020)) and counts 2 through 4 charged him with AUUW under section 24-1.6(a)(1) of the AUUW statute (720 ILCS 5/24-1.6(a)(1) (West 2020)). Count 4 charged Mr. Brown under subsection (3)(C) of the statute with knowingly possessing a firearm on his person with no valid FOID card. *Id.* § 24-1.6(a)(1), (3)(C). Count 3 charged him under subsection (3)(A-5) with knowingly possessing an uncased, loaded, and immediately accessible firearm on his person with no valid concealed carry license (CCL). *Id.* § 24-1.6(a)(1), (3)(A-5). A violation of either of those provisions is, for first-time offenders, a Class 4 felony punishable by one to three years in prison or a period of probation not to exceed 30 months. *Id.* § 24-1.6(d)(1); 730 ILCS 5/5-4.5-45(a), (d) (West 2020). Count 2 charged Mr. Brown with a combination of those two offenses (no FOID card and no CCL), which constitutes a non-probationable offense under the statute. *Id.* § 24-1.6(d)(2). The State nol-prossed count 4 (AUUW based solely on the lack of a valid FOID card) before trial.

¶ 6    Mr. Brown waived his right to a jury, and a bench trial was held on June 2, 2022.

¶ 7    Officer Kyle Gruba testified that at around 11:50 a.m. on January 24, 2021, he was on patrol in an unmarked squad car with his partners, officers Choy and Kotrda, on 111th Street near Indiana Avenue when they passed a red Ford Escape headed in the opposite direction that had no license plates. They turned around and pulled the vehicle over, and Officer Gruba identified Mr.

Brown in court as the driver and only occupant. Officer Gruba testified that, with his body-worn camera activated, he repeatedly asked Mr. Brown to step out of the vehicle. Mr. Brown refused to comply; he had his cell phone in hand and stated that he was broadcasting the encounter on Facebook Live. According to Officer Gruba, this went on for about ten minutes, during which time Mr. Brown asked for a supervisor, and a call was put in requesting one. Officer Gruba described Mr. Brown's demeanor as "irate." Mr. Brown told Officer Gruba that he had already given him his driver's license and that he was not going to come out of the vehicle. Mr. Brown also gave the officers the Wisconsin title to the vehicle, and Mr. Brown's name was not on it.

¶ 8      Officer Gruba further testified that Sergeant Tom Davy and Officer Ghiotto (no first name given) arrived on the scene, and Officer Gruba witnessed them speak to Mr. Brown. Officer Ghiotto asked Mr. Brown if he had a FOID card or a CCL, and Mr. Brown answered no. Officer Ghiotto then asked Mr. Brown if he had any firearms on him or in the vehicle, and Mr. Brown again said no. Mr. Brown was eventually persuaded to stepped out of the vehicle, at which point he told the officers that he did have a firearm on him and that he had a FOID card. Officer Ghiotto recovered a loaded black semiautomatic handgun from Mr. Brown's front waistband, and Officer Gruba recovered from the vehicle a "fanny pack" containing a loaded magazine for the same weapon. Mr. Brown was placed in custody and taken to the local police station.

¶ 9      On cross-examination, Officer Gruba acknowledged that Mr. Brown did not try to evade the officers as they pulled his vehicle over. He agreed that Mr. Brown provided the officers with his driver's license and some title paperwork. Mr. Brown explained to them that his name was not on the title because he had just purchased the vehicle. When he stepped out of the vehicle, Mr. Brown announced to the officers present that he had a firearm and that he also had a FOID card. He told Officer Ghiotto where the firearm was on his person. He did not struggle or try to flee but

3

followed the officers' instructions and placed his hands behind his back to be cuffed. Officer Gruba agreed that Mr. Brown told him at that time that he was afraid. At some point, Mr. Brown produced a FOID card, and Officer Gruba identified a photocopy of it at trial.

¶ 10     We have reviewed the footage from Officer Gruba's and Officer Ghiotto's body-worn cameras, which was introduced at Mr. Brown's trial, and it is generally consistent with Officer Gruba's testimony. The footage from Officer Gruba's camera shows him walking up to the vehicle and immediately asking Mr. Brown to step out, then threatening to break his window if he does not comply, before ever asking for his driver's license or registration. Mr. Brown repeatedly offers his driver's license and asks why he must step out of his car; the officers tell him it is so they can verify that he owns the car. He asks them how stepping out of the car will aid them in doing that, and they continue to insist that he exit the vehicle. He tells them that he does not feel safe. At this point, they ask if he has a FOID card or CCL, and he says no. They ask if he has a firearm, and he says no. The sergeant arrives. Mr. Brown is told that he is under arrest for driving without license plates and that in two minutes he is going to be pulled from the car. Mr. Brown exits the vehicle with his hands up, telling the officers "I got my firearm on me, y'all can take it, I got a FOID card." The firearm is recovered. For the rest of the recording, Mr. Brown appears agitated, cursing and telling the officers that they are stupid for arresting him because he has a FOID card and the money to post bail. He is taken away as officers search his vehicle.

¶ 11     The footage from Officer Ghiotto's body-worn camera is very brief. It shows the officers asking Mr. Brown why he lied to them, telling them he did not have a FOID card, and he says it was because he "didn't want to get out."

¶ 12     The State next called John Strode, the supervisor for the application processing unit of the Illinois State Police (ISP) Firearms Services Bureau (FSB). Mr. Strode explained that the Firearms

Licensing and Regulation Enterprise Software (FLARES) is the electronic database the ISP maintains of individuals in the state who have applied for or been issued FOID cards or CCLs. About a month before trial, Mr. Strode searched the FLARES database for Mr. Brown, using his full name and birthdate, and discovered that he had applied for a FOID card on August 13, 2014. Mr. Strode saw that a FOID card had been retroactively issued to Mr. Brown on August 1, 2014, that was, on its face, valid until August 1, 2024, and that the card was subsequently revoked on October 7, 2015, when it was discovered that Mr. Brown had been adjudicated delinquent as a juvenile in 2004. Mr. Strode explained that the issue date of the FOID card preceded the application date because, at the time, newly issued FOID cards were backdated to the beginning of the month. Mr. Strode testified that Mr. Brown did not have a CCL and had never applied for one.

¶ 13     Mr. Strode further explained that when a FOID card is revoked and there is an e-mail address on file for the holder, an e-mail is sent advising the holder that there has been a change in their status and instructing them to sign in to their web account. A letter to this same effect is mailed to the mailing address on file for the holder instructing them to surrender their FOID card to a local law enforcement agency. Mr. Strode identified such a letter, dated October 7, 2015, and addressed to Mr. Brown at the address on file for him. Mr. Strode testified that the holder of a FOID card or CCL is supposed to alert the FSB immediately if they change their address.

¶ 14     When asked on cross-examination whether he knew for a fact that the FOID card revocation letter he identified was sent to Mr. Brown, Mr. Strode said, "I can only go based off what our system shows." The letter was not sent by certified mail, and no return receipt or signature upon receipt was requested. Mr. Strode testified that, when a revoked FOID card is surrendered, it is shredded, and this is noted in the database. If the card is not returned, no further steps are taken. Mr. Strode did not know why the FSB reviewed Mr. Brown's FOID card application again more

than a year after it was issued, but he said this can happen when a holder is arrested or attempts to purchase a firearm from a dealer.

¶ 15    The State rested, and defense counsel moved for a directed finding on count 1, on the basis that the State had failed to prove that Mr. Brown knew his FOID card had been revoked. The court asked counsel if this argument applied to any of the AUUW counts too, and she said that it was relevant to count 2, in which the State had charged Mr. Brown with knowingly possessing a firearm while not having a valid FOID card or CCL. She acknowledged that her argument did not apply to count 3, for which the State charged Mr. Brown with knowingly possessing a loaded firearm on his person without a CCL, but noted that count 3, unlike count 2, was a probational offense. Counsel asked for findings of not guilty on counts 1 and 2. The State conceded that none of the offenses charged were strict-liability offenses and agreed that it had to prove knowledge. "The question is, knowledge of what?" the assistant State's attorney asked. He maintained that the State only had to prove knowledge as to the possession of the firearm. The trial court denied the motion, and the defense rested.

¶ 16    In its closing argument, the State argued that Mr. Brown's failure to get out of the car immediately upon being pulled over was circumstantial evidence that he knew his FOID card was invalid.

¶ 17    Defense counsel pointed out that Mr. Brown was concerned about being arrested for having a loaded gun on his person without a CCL, and that his reticence to exit the vehicle could therefore not be construed as knowledge that he knew his FOID card was invalid.

¶ 18    The trial court began by noting that it was "kind of perplexed there ha[d] never been any published opinion based on these facts with regard to someone carrying a weapon when their FOID card was revoked." He had struggled with count 1, which he read as a strict liability offense, but

6

understood defense counsel's argument that where the legislature has provided no applicable mental state, "it would defer to be in a knowledge state." The court observed that the evidence was circumstantial. The State's business records indicated that it sent Mr. Brown a letter informing him of the revocation, but there was no evidence that Mr. Brown received that letter. "Whether or not this is valid under the statute," the judge said, "I really don't know." The judge ultimately acquitted Mr. Brown on count 1, noting that although the State had "a very persuasive argument that the actual knowledge [wa]s not required," he would "give the Defendant the benefit of the doubt on that matter with regard to the *mens rea*."

¶ 19    The court moved on to count 3, the "easy count," and found Mr. Brown guilty as charged because "[h]e definitely never had a [CCL]."

¶ 20    As to count 2, the court said, "[w]hile I do understand [defense counsel's] argument that the circumstances surrounding the arrest would indicate that [Mr. Brown] might have believed that he had a Concealed Carry License [violation]" and "he did present [the revoked FOID card] to the police officers at the time that he was *** taken out of the car," the fact that prior to that he had told the officers that he did not have a FOID card or a firearm "infer[red] knowledge on his part, knowledge that the current situation [was] that he did not have a valid currently-issued FOID card." The court recognized that this might be viewed as inconsistent with its ruling on count 1, saying "it may seem like I'm splitting hears [*sic*] here," but the court nevertheless drew a distinction between counts 1 and 2.

¶ 21    Mr. Brown moved for a new trial, on the basis that the State had failed to prove beyond a reasonable doubt that he knew his FOID card was revoked. The court denied the motion. It began by saying that it believed Mr. Brown could be acquitted on count 1 while still found guilty on count 2. The court said, "I think all of us agree that there is no case that is directly on point with

regard to this. I do find the statutes create different crimes here. Count 1 where I found defendant not guilty of, it would be possession of a firearm *** while his FOID card is revoked. However, the second count and the third count indicates that he did not have a validly issued [FOID card] at the time of the offense." The court concluded that when Mr. Brown told the officers initially that he did not have a FOID card, that constituted sufficient circumstantial evidence that he knew his card was no longer valid. "If you have a valid card, why would you tell the police originally *** that you did not have a card."

¶ 22    Mr. Brown was acquitted on count 1 and found guilty on counts 2 and 3. Count 3 merged into count 2 and, following a sentencing hearing, the court sentenced Mr. Brown to 16 months in prison.

¶ 23    Mr. Brown now appeals.

¶ 24                                    II. JURISDICTION

¶ 25    Mr. Brown was sentenced on June 23, 2022, and the court denied his motion to reconsider that sentence on July 12, 2022. Mr. Brown timely filed his notice of appeal the same day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 26                                    III. ANALYSIS

¶ 27    Mr. Brown argues on appeal that his AUUW conviction should be reversed because the State failed to prove beyond a reasonable doubt that he knew his firearm owner's identification (FOID) card was revoked. If we find the evidence was sufficient to support his conviction, Mr. Brown argues in the alternative that the section of the AUUW statute under which he was convicted is facially unconstitutional.

¶ 28    We first address Mr. Brown's sufficiency argument. "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16, (1979), and *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009)). "When the sufficiency of the evidence supporting a criminal conviction is challenged, '[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 57 (quoting *People v. Ward*, 215 Ill. 2d 317, 322 (2005)). Our role as the reviewing court is not to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. "[I]t is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* We will find that the evidence was insufficient to support a conviction only if it was "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 29    The AUUW statute provides, in relevant part, that:

(a)    A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:

(1)    Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; or

(2)    ***; and

(3)    One of the following factors is present:

***

9

(A-5) the pistol, revolver, or handgun possessed was uncased, loaded, and immediately accessible at the time of the offense and the person possessing the pistol, revolver, or handgun has not been issued a currently valid license under the Firearm Concealed Carry Act; or

* * *

(C) the person possessing the firearm has not been issued a currently valid Firearm Owner's Identification Card; ***" 720 ILCS 5/24-1.6 (West 2020).

Where, as here, the State has charged a defendant with a combined, non-probational offense under section 24-1.6(d)(2) of the statute, it must prove that the defendant did not have either a FOID card or a CCL license. *Id.* § 24-1.6(d)(2).

¶ 30    Mr. Brown does not dispute that on January 24, 2021, he carried a loaded firearm on his person without a currently valid CCL or FOID card. He argues only that the State failed to prove beyond a reasonable doubt that he knew his FOID card, which was valid on its face, had been revoked. Although in argument below the State took the position that the knowledge requirement only applied to Mr. Brown's possession of the firearm, that position was severely undermined by our supreme court's decision in *People v. Ramirez*, 2023 IL 128123, ¶ 24, which overturned prior precedent and held that on a charge of possessing a defaced firearm the State must prove a defendant's knowledge both that he possessed the gun and that it had been defaced.

¶ 31    The trial court here agreed that there was no direct evidence that Mr. Brown received the revocation letter in the FSB's database. The court also declined to adopt the State's position that knowledge was not required as to that element. Instead, the court relied on what it viewed as "inferred" or circumstantial evidence that Mr. Brown knew of the revocation. Mr. Brown argues there was insufficient circumstantial evidence to uphold the trial court's finding. He points to the

fact that he continued to carry the FOID card, suggesting he believed it was still valid, and he suggests that his initial reluctance to tell the officers that he had a firearm and a FOID card was due, not to his consciousness of guilt, but to his fear of how he would be treated during that rapidly escalating encounter. Mr. Brown argued below that, even if his conduct was circumstantial evidence that he knew that he was violating the law, he knew he was guilty of carrying a loaded firearm without a CCL and wanted to avoid stepping out of the vehicle for that reason, not because he thought his FOID card was invalid. Mr. Brown argues the trial court should have acquitted him on count 2 for the same reason he was acquitted of a violation of the FOID Card Act on Count 1.

¶ 32    In support of this argument, Mr. Brown relies on two cases: *People v. Sanchez*, 2013 IL App (2d) 120445, and *People v. Hinton*, 402 Ill. App. 3d 181 (2010). These are two cases in which we refused to affirm a conviction based on the kind of inference that the State suggests we can draw from the evidence in this case.

¶ 33    We concluded in *Sanchez* that the State failed to prove the defendant in that case knew the social security number she had been using belonged to someone else, an essential element of a charge of identity theft. *Sanchez*, 2013 IL App (2d) 120445, ¶ 39. The defendant knew that she did not have a valid social security number and had purchased false documents but believed that the number on them had been randomly generated. *Id.* ¶ 8. When initially interviewed by the police, she denied knowing the person whose name was on the card she had been using when, in fact, the person was a friend of her mother's. *Id.* ¶ 27. This was not enough, we concluded, to support a conviction that required her to have known that the number on the card was someone else's. There was no evidence that the mother's friend had shared the number with the defendant or that the defendant otherwise had access to it. *Id.* ¶ 28. We noted that " '[i]f an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is *not* a

reasonable inference but is instead mere speculation.' " (Emphasis added.) *Id.* ¶ 32 (quoting *People v. Davis*, 278 Ill. App. 3d 532, 540 (1996)). No matter how plausible the State's story or how suspicious the circumstances, without evidence to support the theory that the defendant had obtained the social security number somehow and provided it to the forger, rather than the other way around, "it remain[ed] speculation rather than a reasonable inference." *Id.*

¶ 34    In *Hinton*, 402 Ill. App. 3d at 185, we reversed a defendant's conviction for violating a protective order because, although the State presented evidence that the defendant knew an emergency order of protection had been entered, which might lead to the entry of a plenary order, no evidence showed that he knew a plenary order had actually been entered. We noted in *Hinton* that "[p]roof of actual knowledge cannot be based on circumstances that give rise only to conjecture and suspicion." *Id.* "Whether based on circumstantial or direct evidence," an inference of knowledge "must be based on established facts and not pyramided on an intervening inference." (Internal quotation marks omitted.) *Id.*

¶ 35    This case is similar to *Sanchez* and *Hinton.* As in those cases, the only argument the State could make that Mr. Brown knew his FOID card had been revoked was based on inferences that do not necessarily follow from the circumstances. True, he did not immediately volunteer that he had a FOID card, but that suggests nothing about the FOID card, because he also did not have a CCL. The conclusion that Mr. Brown knew that years earlier his FOID card had been revoked, like the conclusion in *Sanchez*, 2013 IL App (2d) 120445, ¶ 32, that the defendant there knew the social security number on her forged documents belonged to a real person, remained speculation, rather than a reasonable inference.

¶ 36    The State insists that this case is different from *Sanchez* and *Hinton* because here the State also presented the testimony of Mr. Strode regarding the circumstantial evidence contained in the

FLARES database. The State says that the revocation letter generated by the FSB "was not only mailed to the address on file for [Mr. Brown] but also *would've been* sent via email." (Emphasis added.) The evidence did not show that the letter "was" mailed, however, only that it should have been. And no evidence was presented that it was sent to Mr. Brown by email. The State then insinuates that Mr. Brown may not have received the FSB's revocation letter because he failed to inform them of a change of address, but there is likewise absolutely no evidence to that effect anywhere in the record.

¶ 37    Finally, the State cites *People v. Price*, 225 Ill. App. 3d 1032, 1035 (1992), where this court found that the evidence supported a charge of misconduct against a public meat inspector because the State had proved beyond a reasonable doubt that he had knowingly performed an act that was forbidden by law—*i.e.*, carried a firearm while on duty. We noted that the rule was included in the inspector's employment manual, the contents of which he was required to know. The State argues that "[s]imilarly, here, [Mr. Brown] was required to know the contents of the FOID Card Act." But that is not the knowledge that the State was required to prove here. It was required to prove that Mr. Brown knew that his FOID card had been revoked after it was issued to him, when he had done nothing in the interim that should have impacted his eligibility. That was information contained only in the FLARES database. And Mr. Brown is certainly not responsible for knowing the contents of the FLARES database.

¶ 38    There is nothing about the circumstances of the revocation itself that would have alerted Mr. Brown that his FOID card might no longer be valid. The card was not revoked for a new criminal violation, but because, for some unknown reason, the FSB took another look at Mr. Brown's application over a year after it issued him a FOID card and saw that he had a juvenile adjudication from 2004, ten years before he applied for and received his FOID card. Mr. Brown

would have no reason, absent his receipt of the FSB's revocation letter, to suspect that the FOID card was not valid until August 1, 2024, as stated on the card itself.

¶ 39     Given all of this, we agree with Mr. Brown that the State failed to prove beyond a reasonable doubt that he knew his FOID card had been revoked. For all of the same reasons the trial court acquitted Mr. Brown on count 1, for knowingly possessing a firearm without a FOID card, it should likewise have acquitted him on count 2. We therefore vacate his conviction on count 2. Having done so, we need not consider Mr. Brown's alternative argument that the AUUW statute, which prohibits adults who were adjudicated delinquent as juveniles from possessing firearms (720 ILCS 5/24-1.6(a)(3)(D) (West 2020)) is facially unconstitutional.

¶ 40     Although Mr. Brown has by now served his sentence on the more serious offense in count 2, we conclude that the proper remedy is to remand. See *People v. Relerford*, 2017 IL 121094, ¶¶ 71, 75 (noting that "there is no final judgment in a criminal case unless sentence has been imposed" and that the appellate court's jurisdiction over nonfinal, merged convictions is "limited to ordering a remand for imposition of sentences on the lesser convictions"). In light of our vacatur of count 2, we therefore remand for reinstatement of the merged count 3, the AUUW charge based on Mr. Brown's failure to have a CCL.

¶ 41                                    IV. CONCLUSION

¶ 42     Because the State failed to prove beyond a reasonable doubt that Mr. Brown knew his FOID card, which was valid on its face, had been revoked due to an adjudication of juvenile delinquency occurring before the card was issued, Mr. Brown's AUUW conviction based in part on his failure to have a currently valid FOID card (count 2) is vacated. We remand this case to the trial court to reinstate Mr. Brown's AUUW conviction based on a failure to have a valid CCL (count 3) and to impose a sentence on that count.

¶ 43    Vacated in part; remanded with directions.