**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230542-U

Order filed November 7, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Bureau County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0542 Circuit No. 20-CF-51 |
| DAVIJION JAVONTE ROBINSON, | ) ) ) | Honorable James A. Andreoni, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Brennan and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The evidence was sufficient to support the trial court's finding that defendant did not act in self-defense.

¶ 2     Defendant, Davijion Javonte Robinson, appeals his convictions for first degree murder and aggravated battery with a firearm. He contends the State failed to prove beyond a reasonable doubt that he did not reasonably believe his actions were necessary to protect himself. We affirm.

¶ 3                                         I. BACKGROUND

¶ 4    A grand jury indicted defendant on first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)), and aggravated battery with a firearm (*id.* § 12-3.05(e)(1)). The charges stemmed from the July 1, 2020, shooting death of Caleb Conrath and injury of Tasha Hilmes. Defendant elected a bench trial.

¶ 5    Hilmes testified on July 1, 2020, she lived in a trailer in Princeton, Illinois with her sons Caleb and Christopher Conrath. Hilmes was aware Caleb sold cannabis, but she was not directly involved in the operation. The customers that came to the house were their friends and had been invited over "for cookouts and things of that nature." Defendant came to the residence approximately a dozen times prior to July 1, 2020. When defendant came over, Hilmes did not interact with him at length.

¶ 6    At about 4 p.m. on July 1, 2020, Hilmes was in her trailer with Caleb and Christopher. Christopher was in his bedroom and Caleb was in the kitchen. Defendant came to the front door, and Hilmes, who was seated in the living room, invited him inside. She greeted defendant, and he walked back into Caleb's bedroom. Caleb followed shortly thereafter. After about 5 to 10 minutes, Hilmes heard Caleb say "stop, stop," in a scared, frantic tone and then heard two gunshots. Hilmes ran down the hallway to Caleb's bedroom. As she approached, she noticed the trailer's side door was open and defendant was standing in front of a television, holding a gun in his left hand. Hilmes entered Caleb's bedroom, and defendant shot her in the shoulder. Hilmes fell to the ground in front of the television. She testified that she was unarmed.

¶ 7    Defendant attempted to exit through the side door. Caleb moved to follow him. As defendant ran down the hallway, he shot Caleb in the chest. Caleb fell into a litter box, which was located near the side door. Hilmes testified Caleb was not holding anything when he was shot and was unarmed. After the final gunshot, Christopher emerged from his bedroom and called 911. By

2

that time, defendant had fled through the side door of the trailer. Defendant was holding a gun and bags of cannabis as he exited. Christopher removed a box of cannabis from their trailer. She did not allow guns in the trailer because she did not like them. After the shooting, Hilmes was taken to the hospital. She sustained a broken clavicle from the gunshot wound and underwent surgery.

¶ 8        Christopher testified that at about 3:45 p.m. on July 1, 2020, he returned home from work and went to his bedroom, which was on the opposite side of the trailer from Caleb's bedroom and the side door. The family did not use the side door. After being home for a brief time, someone brought the dog into Christopher's room. This was a common occurrence when someone visited. Eventually, Christopher heard approximately five loud pops in quick succession. At first, Christopher believed the sound was fireworks but knew they were coming from inside the trailer because of how loud they were. Christopher exited his bedroom. Upon reaching the hallway, he saw Caleb with his arm up. Christopher saw Caleb fall face first into the litter box in the hallway near the side door. Christopher saw Hilmes holding her shoulder, which was bleeding. Christopher called 911. He did not see anyone else in the trailer and the side door was open. He heard a car door slam and "tires peel off *** very, very fast."

¶ 9        Christopher saw a box in Caleb's bedroom which contained several bags of cannabis. Christopher took the box outside, intending to put it in the trunk of his vehicle. He was unsure about Caleb's condition at that time and did not want him to incur legal trouble for possessing the cannabis. As Christopher was placing the box into his trunk, his neighbor, Sean Starbuck, approached him. Starbuck said he would take the box, which Christopher allowed. To Christopher's knowledge, the box only contained cannabis, but he acknowledged he had not looked inside. Christopher stated there were no guns in the house except for his BB gun, and he had never seen Hilmes or Caleb with a firearm. He explained Hilmes had no tolerance for guns

3

and would not "put up with" them in her house. Christopher indicated his BB gun was hung up on his bedroom wall during the incident and had not been moved.

¶ 10    Starbuck testified he lived in the trailer directly to the east of Hilmes's trailer. They had been neighbors for several years before July 1, 2020. At approximately 4 p.m. on July 1, 2020, Starbuck was on his front porch. He observed a Nissan pull up to Hilmes's trailer. Defendant exited the passenger side of the Nissan and entered the trailer. Starbuck went inside his trailer and "not even 10 minutes after that *** heard three loud pops." Starbuck returned to his porch and observed defendant exit the side door of Hilmes's trailer and run toward the Nissan. Defendant was carrying a bag and an item Starbuck believed to be a gun. Defendant entered the Nissan. It sped off and took an immediate right turn.

¶ 11    Starbuck then saw Christopher exit the trailer with three boxes stacked inside of one another. Starbuck approached Christopher and said he would take the boxes. The boxes were saturated in blood. Based on the blood and the sounds he had heard, Starbuck believed something bad had occurred, and he did not want Christopher to drive off with the boxes. Starbuck brought them inside his trailer and unpacked five large bags of cannabis. No firearms were in the boxes. Starbuck never observed Christopher with any type of weapon.

¶ 12    Starbuck did not initially inform the police about the boxes because he was having a panic attack and not thinking clearly. Later that day, he was again contacted by the police, and he told them about the boxes. Starbuck consented to a search of his residence. He showed the police the boxes and cannabis. The police did not observe any firearms or ammunition in Starbuck's residence.

¶ 13    Officer Tyler Wolf testified he arrived at Hilmes's trailer within two minutes of receiving the call that two people had been shot. He was the first officer to arrive on scene. Wolf entered the

4

residence and saw Caleb lying face down, unresponsive, in the hallway. He attempted to render aid to Caleb. Hilmes was conscious and alert, and a gunshot wound on her shoulder. Wolf did not see any firearm or weapon of any kind inside the trailer. Wolf spoke with witnesses in the area and obtained a description of the suspected shooter and vehicle.

¶ 14    Andon Shafer testified he knew defendant from school. On July 1, 2020, Shafer gave defendant a ride to Hilmes's trailer in his sister's Nissan Altima. Shafer assumed defendant was purchasing cannabis because he had brought defendant to Hilmes's trailer once before to do so. As Shafer was parking, defendant directed him to perform a U-turn and park facing the exit to the trailer park. Shafer waited in the vehicle as defendant went inside. Approximately 20 minutes later, Shafer observed defendant running out of the trailer with three bags of cannabis and a gun in his hand. Defendant entered the Nissan and told Shafer to drive. Shafer took off rapidly. Defendant told him he shot Caleb and Hilmes after Caleb had attempted to shoot him. When Caleb's gun jammed, defendant fired back. Defendant told Shafer he believed he had killed Hilmes. Defendant directed Shafer to drive on backroads to Kewanee. While driving, a squad car pulled behind Shafer and initiated a traffic stop. Shafer fled, eventually turning into a private driveway and driving through the yard until he reached a fence. At that point, Shafer and defendant exited the Nissan and fled on foot. Defendant managed to flag down a passing vehicle, and they were taken to a house in Kewanee. Shafer called his mother to pick him up and then turned himself in to the police.

¶ 15    The evidence showed three bags of cannabis, totaling 2.85 pounds, were recovered from the passenger floorboard of the Nissan. Four fired 9-millimeter cartridge casings were recovered from Hilmes's trailer. These four cartridges were located (1) in the cat litter box in the hallway to Caleb's bedroom, (2) on the seat of a chair in Caleb's room, (3) inside a plastic tote underneath the television in Caleb's room, and (4) underneath Caleb's television stand. An unfired 9-

5

millimeter round was discovered on the floor in Caleb's room. The parties stipulated the four casings and one live round all came from the same firearm. No other ammunition was found in Hilmes's trailer.

¶ 16        Forensic evidence established that Caleb sustained four gunshot wounds to his body. There was no stippling or gunpowder present around the wounds, indicating the bullets were fired from more than 24 inches away. One bullet entered Caleb's chest, damaging the right ventricle of his heart. This damage caused his heart to stop beating, making it a fatal wound. Caleb sustained three other nonfatal wounds: (1) through his left forearm near the wrist, (2) through the middle finger of his right hand, and (3) on his right thigh just above the knee. The wound to Caleb's right hand was consistent with having his hands up, if the shooter was in front of him. The hand wound was not consistent with Caleb holding something in his right hand, which would have resulted in an injury to the palm. The wound on Caleb's right thigh tracked from front to back at a sharp angle. If Caleb were in a standing position, the barrel of the gun would have had to be below his knee and within eight inches of his leg to create that trajectory.

¶ 17        Portions of four recorded telephone calls made by defendant from the Bureau County jail were admitted into evidence. The calls were made on August 17, 2021, April 21, 2022, and May 12, 2022. On August 17, 2021, defendant said, "It's cool, it's my fault. *** I did it. *** I did the crime so I gotta do the time." On April 21, 2022, defendant said he thought the unfired bullet belonged to Caleb, but the State said it was from defendant's gun. Defendant disclosed he did not know where his gun was because he threw it. On May 12, 2022, defendant said they were waiting on the ballistic report results, but he did not understand why when he knew the bullets were his. He also said if the bullets came back as his, it would "be hard for [him] to get off on self-defense." Defendant questioned why his attorneys wanted to retest the bullets he knew came from his gun.

6

¶ 18　　　　Defendant testified that in January 2020 he became familiar with Caleb through Snapchat. Defendant contacted Caleb to purchase cannabis from him. After the initial purchase, defendant proceeded to purchase cannabis from Caleb twice a month leading up to July 1, 2020. When defendant went to Hilmes's trailer to make these purchases, Caleb would have a gun in the waistband of his pants. On one occasion, defendant purchased cannabis from Hilmes when Caleb was not available. Defendant testified Hilmes had a gun in her pocket during the sale.

¶ 19　　　　On July 1, 2020, defendant obtained a ride to Hilmes's trailer from Shafer. Defendant denied telling Shafer to turn the vehicle around and park facing the exit. Hilmes let defendant into the residence, and he went to Caleb's bedroom. Caleb was wearing his gun on the right side of his waistband. Defendant and Caleb began weighing the cannabis and counting the money. After approximately 10 minutes, defendant left to use the restroom. When he returned, Caleb told defendant that defendant owed him $1000. Caleb would not explain why defendant owed the money and an argument ensued. According to defendant, Caleb drew his gun and pointed it at defendant's chest. They were approximately five feet apart. Defendant stated he was scared for his life. Caleb told defendant to give him everything he had in his pocket. Defendant put his hands in the air and refused to give Caleb anything. Defendant testified Caleb stated, "you don't think I'll shoot you" and pulled the trigger.

¶ 20　　　　Defendant heard a clicking noise, but Caleb's gun did not fire. In response, defendant pulled out his own gun and began shooting. Caleb was using both hands, "trying to cock his gun back." Defendant shot Caleb in the leg and the arm. On the next shot, he attempted to shoot the gun out of Caleb's right hand. Defendant testified that, after being shot three times, Caleb again pointed his gun at defendant, at which time defendant shot Caleb in the chest. All four shots occurred in Caleb's bedroom in a span of approximately five seconds. Defendant testified Caleb

7

was not affected by the three nonfatal shots and continued to attempt to cock his gun. Defendant exited the bedroom as Caleb fell to the ground after being shot in the chest. He encountered Hilmes in the hallway, and she attempted to disarm him. Defendant indicated he suspected Hilmes might have a gun based on his prior experience with her and feared for his life. A struggle ensued and defendant shot Hilmes in the shoulder. Defendant turned to leave out the side door of the residence and felt a tug on his shirt. Caleb stood behind him and then fell face first to the ground.

¶ 21 Defendant exited the residence and ran to Shafer's vehicle holding bags of cannabis and his gun. Defendant told Shafer to take the backroads to Kewanee and directed him on the route to take. Eventually a squad car began following them and attempted to stop Shafer's vehicle. Defendant told Shafer to turn into a private drive. When they could not go any farther, defendant and Shafer fled on foot. Defendant ultimately fled the jurisdiction and evaded the police for 13 months.

¶ 22 The court found defendant guilty of both charges. In so doing, the court deliberated on whether Caleb possessed a gun, and if he did, whether he was still a threat to defendant after having been shot three times. The court declined to make a finding as to whether Caleb possessed a gun, instead finding that, even if he did possess a gun, it was unreasonable to believe he posed a threat to defendant after having been shot in the forearm, hand, and leg. It expressly found defendant was not justified in firing the fatal shot at Caleb. The court made no finding regarding the initial shots defendant fired. The court found defendant's claim of self-defense for aggravated battery with a firearm failed because he shot Hilmes while in the commission of the forcible felony of murder.

¶ 23 The court then considered whether defendant was guilty of second degree murder. To make this determination, the court discussed whether defendant had established by a preponderance of the evidence that Caleb possessed a gun. It explained there was evidence presented to establish

8

both positions and could not find either side could "tip the scale" and convince it whether Caleb possessed a gun. Accordingly, it found defendant had not established his burden of proving a mitigating factor by a preponderance of the evidence.

¶ 24    The court denied defendant's posttrial motion and sentenced defendant to 45 years' imprisonment for first degree murder, consecutive to 6 years' imprisonment for aggravated battery with a firearm.

¶ 25    This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27    On appeal, defendant argues the evidence was insufficient to prove beyond a reasonable doubt he did not act in self-defense. Once a defendant presents evidence supporting an affirmative defense of self-defense, the State is required to prove beyond a reasonable doubt, in addition to the elements of the charged offense, that defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). "The relevant standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense." *Id.* at 225. Reversal is warranted only when the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt as to defendant's guilt. *People v. Flowers*, 306 Ill. App. 3d 259, 266 (1999). When considering a challenge to the sufficiency of the evidence, we will not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "Thus, it is our duty *** to carefully examine the evidence while giving due consideration to the fact that the court *** saw and heard the witnesses." *Id.*

¶ 28    The elements of self-defense are (1) a person was threatened with unlawful force; (2) the person threatened was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) the threatened person "actually and subjectively believed a danger existed that

9

required the use of the force" which was applied; and (6) this belief was objectively reasonable. *Lee*, 213 Ill. 2d at 225. If the State negates any element of self-defense, the claim fails. *Id.*

¶ 29 At the outset, we note the trial court said that it could not determine either way whether Caleb possessed a firearm during the incident. However, we may affirm the trial court "for any reason or ground appearing in the record regardless of whether the particular reasons given by the trial court, or its specific findings, are correct or sound." (Internal quotation marks omitted.) *Akemann v. Quinn*, 2014 IL App (4th) 130867, ¶ 21; see also *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 27.

¶ 30 Taken in the light most favorable to the State, the evidence was sufficient to establish that (1) Caleb was not the initial aggressor, (2) defendant was in no imminent danger from Caleb, and (3) any belief he had that danger existed was objectively unreasonable. The evidence demonstrated that defendant shot Hilmes in the shoulder and Caleb in the leg, arm, and hand while in Caleb's bedroom. Caleb moved into the hallway toward the side door and was fatally shot by defendant in the chest. The only evidence presented to show Caleb possessed a gun was defendant's testimony. No guns or ammunition other than the casings and live round from defendant's 9-millimeter were located. The wound on Caleb's right hand, which defendant testified Caleb was holding a gun with, was not consistent with holding an object. Forensic evidence established that the wound was consistent with someone who had their hands up while standing in front of their shooter. Moreover, the court's findings and comments indicate it did not find credible defendant's testimony regarding the lack of impact of the gunshot wounds on Caleb. Specifically, the court found the wounds inflicted on Caleb's arm and right hand would have rendered him harmless to defendant by the time the fatal shot was fired. Thus, we agree with the court that the State disproved defendant's

10

claim of self-defense beyond a reasonable doubt and affirm defendant's first degree murder conviction.

¶ 31    In reaching our conclusion, we reject defendant's argument that the court's finding was erroneous where the shots were fired in quick succession in a moment of great fear and stress. As stated above, we can affirm for any reason in the record, and we have found that the State negated multiple elements of self-defense with the evidence presented. Moreover, this determination precludes defendant's argument that he proved imperfect self-defense, and we decline to reduce defendant's conviction to second degree murder.

¶ 32    Further, we affirm defendant's conviction for aggravated battery with a firearm. As the court stated, section 7-4 of the Criminal Code of 2012 provides that a justification defense is not available to individuals who are "attempting to commit, committing, or escaping after the commission of, a forcible felony." *Id.* § 7-4(a). Because we have affirmed defendant's conviction for first degree murder, self-defense remains inapplicable to the aggravated battery charge against Hilmes because defendant had just committed the forcible felony of murder.

¶ 33                        III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Bureau County.

¶ 35    Affirmed.